OPINION OF THE COURT
John Copertino, J.
Gerald Philbin, plaintiff in action No. 1 and defendant in *71 action No. 2, has moved to vacate a judgment entered against him on May 12, 1989, and an order dated February 27, 1989, "which allows the FDIC [Federal Deposit Insurance Corporation] to recover against Gerald Philbin the total sum of $252,057.86.”
The FDIC, defendant in action No. 1 and plaintiff in action No. 2, has cross-moved "for an order disqualifying Jack F. Scherer, Esq. as attorney for Gerald Philbin, pursuant to Disciplinary Rule 5-102.”
Central National Bank, the entity originally sued by Phil-bin, was declared insolvent by the Comptroller of Currency in September 1987, and the FDIC was appointed receiver of its assets.
In February 1989, the FDIC moved for summary judgment in action No. 2 and for dismissal of the complaint in action No. 1. The motion was granted on default, and the judgment now sought to be vacated was subsequently entered.
The dispute between the parties began on March 5, 1981, when Philbin made a promissory note payable on demand to Central State Bank (the predecessor of Central National Bank of New York) in the amount of $105,000; thereafter and on July 22, 1981, Philbin made another promissory note payable on demand to the same bank in the amount of $150,000. No qualifying or conditional language was contained in either note. As collateral for the loans evidenced by the notes, 7,400 shares of Adobe Oil stock were deposited with the bank.
Philbin made no payments on the notes and Central National Bank sold the stock. In August 1983, Philbin commenced an action against the bank seeking either a return of the stock or the value thereof at the time of its sale. In and around the same time Central National brought an action against Philbin for the amount of the deficiency. Philbin’s answer contained a counterclaim reciting that the bank never paid the proceeds of the loan to the maker and converted the Adobe Oil stock, and demanding judgment in the sum of $229,404. The bank replied that Philbin had received consideration for the notes, that the sale of the collateral was due to the default in payment, and that after proper notice Philbin failed to timely object to the sale thereby waiving the right to object thereto. Laches was also alleged.
Philbin seeks to open his default on the summary judgment motion by citing ongoing settlement discussions between his attorney and the FDIC in and about the time of FDIC’s *72 motion. His then-attorney, Peter Newman, has submitted a copy of a letter dated February 22, 1989, addressed to the court with a copy being forwarded to the FDIC’s attorney "requesting an adjournment [of the motion] on consent * * * until March 27, 1989.” Philbin maintains that he has always contested the bank’s (and the FDIC’s) position vis-á-vis his responsibility on the notes and would not have knowingly defaulted on such a motion. He also points out that a settlement had been under discussion — although not finalized— which would have resulted in a discontinuance of the respective actions of both parties without payment by either party to the other.
In support of his claim and counterclaim, Philbin notes that the FDIC does not dispute that he did not receive the proceeds of the loan and that, in fact, the bank checks representing the proceeds of the loan which had been made out to his order, bore his forged signature and were paid to the Kerri Pontiac Corporation (an automobile dealership) and to one Thomas O’Donnell. Philbin urges that his defense of failure of consideration is not nullified — as the FDIC contends — by the holding in D’Oench, Duhme & Co. v Federal Deposit Ins. Corp. (315 US 447). He argues that D’Oench requires the maker of a facially unqualified note to have "lent himself to a scheme or arrangement” before such maker may be held liable to the FDIC, and that he has not done this. Philbin also argues that he was a bona fide borrower who at no time entered into a scheme or secret agreement of any kind and who was wholly innocent of wrongful conduct, be it his or in concert with the bank.
The FDIC stresses that Philbin fails to allege that his signatures were forged on the notes — as distinguished from the checks representing the proceeds of the loan — and that Philbin’s testimony given in an examination before trial is to the effect that it was agreed between him and O’Donnell and known by the bank that O’Donnell was to repay the loans, despite the lack of a recital to that effect in the notes. Philbin testified that ultimately a broader plan had to be followed whereby O’Donnell, who was applying to the same bank for a $3 million loan in order to purchase a hotel — in which Philbin later became a principal — would repay Philbin the sums of $54,000 and $104,000 owed to him by O’Donnell, "off the top” of that loan.
Philbin testified further that unless O’Donnell continued to meet his obligations to the bank and others the $3 million loan would not be made. Any divisions of the Philbin loan *73 proceeds to O’Donnell could have been to Philbin’s advantage in that O’Donnell would have still remained eligible for the hotel loan by using the diverted moneys to meet his obligations. Parenthetically, this loan for the $3 million failed to materialize and therein could lie the problem. It would appear that Philbin was forced by O’Donnell into a situation of "throwing good money after bad.”
The FDIC points to the following from page 12 of Philbin’s deposition upon oral examination:
"Q So you’re telling me that the money that you were getting from — supposed to get from Central State Bank as a result of signing this note was supposed to somehow be repayment from Mr. O’Donnell?
"A It was supposed to come to me directly, yes. I was supposed to get the money. He was going to guarantee the payment.
"Q What were you going to do with the money?
"A What was I going to [sic] with the money?
"Q Yes.
"A Number one, I was going to take the money back that he owed me, and he was guaranteeing the payment.
"Q What were you going to do with the balance?
"A He was going to get the balance and guarantee the payment.”
The foregoing, contends the FDIC, brings Philbin within the D’Oench doctrine wherein the FDIC as a receiver can avoid a defense, regardless of whether the maker of the note intended to mislead because Philbin had "lent himself’ to the bank’s effort to mislead bank authorities, that regardless of actual intent Philbin was chargeable with knowledge that he was "asking the bank to conceal the actual transaction.”
An unpublished decision involving this issue, Federal Deposit Ins. Corp. v Barkan (US Dist Ct, ND Cal 1972), is cited by the FDIC as follows: "Under the policy expressed in D’Oench v Duhme and expanded in [other cases] the FDIC in its role as receiver is entitled to rely on the assets of a bank at their face value; a secret agreement between the bank and the borrower cannot provide a defense under such circumstances.”
The FDIC further alludes to Langley v Federal Deposit Ins. Corp. (484 US 86, 93 [1987]): "Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a *74 scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of the performance of a counterpromise (as in D’Oench, Duhme) or of the truthfulness of a warranted fact.”
DECISION
Twice in his supporting affidavit on his motion to vacate Mr. Philbin has declared that he advised Mr. Lauter (a bank officer), in connection with both loans, that he was not going to be responsible for repaying the loans.
Page 17 of the transcript of Philbin’s deposition reads: “everything was based on this $3 million loan that O’Donnell was going to get * * * and the monies from the loan were going to be taken off the top to pay the note that I had signed that he had put into Kerri Pontiac.”
The recent unpublished decision in Federal Deposit Ins. Corp. v Kevelson (US Dist Ct, SD NY 1989) is set forth here in extenso, inasmuch as it embraces the principles which are found applicable to the issues in the matter at hand.
“endorsed memorandum

"Owen, District Judge:

"Plaintiff FDIC, in its capacity as the receiver of an insolvent bank, moves for summary judgment on a $596,160 unconditional promissory note executed by defendant, who had been the chairman of the board of the bank. The FDIC alleges and documents the making of the note by defendant, defendant’s notice and apparent acceptance of the alleged loan, the FDIC’s receivership, and the FDIC’s demand for repayment. Defendant seeks to defeat summary judgment with affirmative defenses of lack of consideration and lack of authorization, arguing that the note was signed but left in blank, the amount to be filled in later, that he certainly never received the loan and could not remember having received notice of it.
“These defenses cannot defeat the FDIC’s rights on the note, under federal common law principles established in D’Oench, Duhme & Co. v. FDIC, 315 US 447 (1942), so the FDIC is entitled to summary judgment as a matter of law. In D’Oench, the Supreme Court barred assertion of side agreements rendering unenforceable a facially valid note, because such side agreements would permit banks to mislead regulators and the public as to their assets, undermining the stability of the banking industry. Id. at 461-62; see Howell v. Continental *75 Credit Corp., 655 F2d 743, 745-46 (7th Cir. 1981) (citing cases). This federal common law rule of estoppel holds where, as here, the FDIC acts as receiver, and the defenses of lack of consideration or lack of authority to fill in a blank note are asserted. FDIC v. McClanahan, 795 F2d 512, 515-17 (5th Cir. 1986); cf. Savings Bank of Rockland County v. F.D.I.C., 668 FSupp. 799 (S.D.N.Y. 1979) (distinguishing D’Oench on other grounds). The D’Oench rule applies most forcefully against knowledgeable defendants, like Kevelson. See McClanahan, 795 F2d at 515.
"The asserted defenses’ failing to raise material issues, the FDIC is entitled to summary judgment on the note, and the action is dismissed.”
Here, the Philbin notes were among the assets that came into the possession of the FDIC as receiver. This agency has the duty to realize on such assets, on behalf of the bank depositors, investors, creditors, et cetera. It is beyond question that the notes were "facially unqualified,” Philbin’s assertions that the bank was informed that he had no intention of repaying the notes, that the transaction was ultimately based on O’Donnell’s obtaining a $3 million loan out of which the notes would be repaid to the contrary notwithstanding.
When asked whether he had sought the return of his collateral, after failing to receive the loan proceeds, Philbin replied:
"again, it was a decision based upon the $3 million.
"Q What do you mean by that?
"A Well, that the note had to have collateral and by starting trouble right now they would never get the $3 million.
"Q I see. So are you telling me that you agreed to wait?
"A I agreed to wait because he said that definitely when they got the loan, the note, the monies that they gave on these notes would be taken from the top and I was to be returned my collateral.”
It should be pointed out that AV2 months after signing the first note, and not having received the proceeds of that loan, Philbin made another note. The second note was made and delivered though Philbin had previously been told that a check he was to have received as the loan proceeds on the first note, went, instead, to Kerri Pontiac Corporation.
It is evident that Mr. Philbin "lent himself’ to a situation *76 which resulted in the bank’s depositors and stockholders being disadvantaged by the loss resulting from his default and the deficiency after the sale of the collateral.
In Federal Deposit Ins. Corp. v Sarvis (697 F Supp 1161, 1164 [1988]), this is said: "By executing the note in such a manner, the defendant clearly lent himself to a scheme or arrangement that was likely to mislead the FDIC. Indeed, the purpose behind § 1823(e), and D’Oench is to protect the FDIC from the very type of unwritten 'understanding’ behind which the defendant here seeks refuge.”
In Sarvis (supra), defendant executed a promissory note to the bank for $25,000, without qualification or condition therein. Nevertheless, the maker’s understanding was that the proceeds of the loan would be used to purchase stock in a holding company; he alleged that he received neither the loan proceeds nor the holding company stock certificate. The bank became insolvent and the FDIC was appointed its receiver. The court disallowed a defense of lack of consideration.
The FDIC calls attention to this quote from Federal Deposit Ins. Corp. v Oehler (252 NW2d 728, 730-731 [Iowa 1977]) which is most appropriate: "When a person joins with a bank in creating paper which is ostensibly valid, he will not be heard to say against depositors, creditors, examiners, FDIC or receivers that the paper is not valid, notwithstanding absence of consideration, assurances of nonliability, or fraud. The ostensible debtor is in pari delicto by his very act of aiding in misleading others.”
Returning to D’Oench, Duhme & Co. v Federal Deposit Ins. Corp. (315 US 447, 460, supra) the key words are "lent himself to a scheme or arrangement”. Here, there can be no dispute that Philbin was a participant, the maker of a note to the bank. While the word "scheme” has an evil or nefarious connotation, the alternative "arrangement” bears no such implication. While it may not be said Philbin lent himself to a scheme he nevertheless did lend himself to an arrangement; and it is this that compels that he bear the loss.
It is concluded therefore that Gerald J. Philbin has not established an essential ingredient to open the default and vacate the judgment, to wit: merit in his claim and counterclaim (Sanders & Assocs. v Hague Dev. Corp., 100 AD2d 964 [2d Dept 1984]).
Accordingly, the motion to vacate the judgment and order herein is denied in all respects. The request to reduce the *77 amount of the judgment is also denied, inasmuch as the argument therefor ignores the right of the FDIC to include interest on the notes in the computation of the total amount due.
The FDIC’s cross motion to disqualify Jack Scherer is denied as moot in view of the finality of this decision.